## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

IN THE MATTER OF THE SEARCH OF
446 WEST MAIN STREET, MONROE,
MAINE

No. 1:23-mj-00184-KFW

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent Kyle Bishop, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the real property and structures located thereon at 446 West Main Street in Monroe, Maine, hereinafter "SUBJECT PREMISES," further described in Attachment A for the things described in Attachment B.

2.     I am a Special Agent with the United States Department of Agriculture – Office of Inspector General ("USDA-OIG"). As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

3.     I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. I am also a graduate of the Rhode Island Police Academy and the U.S. Coast Guard Maritime Law Enforcement Academy. I hold a bachelor's degree in criminal justice and a master's degree in education.

4.      As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute search warrants issued under the authority of the United States. Specifically, I am authorized to conduct and supervise investigations relating to the programs and operations of the United States Department of Agriculture; to make arrests, execute warrants, and carry firearms as authorized by the Agriculture and Food Act of 1981 (P.L. 97-98); and to exercise all duties and responsibilities authorized by the Inspector General Act of 1978 or incident thereto, including the authority to obtain United States Department of Agriculture records and information, to administer oaths, and to undertake other duties as necessary in support of the mission of the Office of Inspector General.

5.      I investigate animal fighting as part of my duties as a Special Agent of the U.S. Department of Agriculture. I have personally participated in numerous dogfighting investigations across the United States including executing multiple dogfighting-related search warrants. I have received and provided specialized training related to animal fighting and related federal offenses. Through training, investigations, and undercover contacts of persons involved in animal fighting offenses, I am familiar with the actions, traits, habits, and terminology utilized by subjects involved in dogfighting ventures.

6.      I am familiar with the facts set forth in this affidavit based on my personal observations and information provided to me by other law enforcement personnel participating in this investigation. I am also familiar with the facts set forth herein based on my review of documents, reports, photographs, and video and audio files.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, probable cause exists to believe that violations of 7 U.S.C. § 2156 and 18 U.S.C. § 49, which prohibit, among other things, sponsoring or exhibiting an animal in an animal fighting venture; buying, selling, delivering, possessing, training, or transporting animals for participation in an animal fighting venture; and the use of the postal service or other interstate instrumentality for promoting or furthering an animal fighting venture; aiding and abetting the same, in violation of 18 U.S.C. § 2; and/or conspiracy to commit the same, in violation of 18 U.S.C. § 371 (the "Subject Offenses") have been committed by David Frazer ("Frazer"), John Murphy ("Murphy"), and other persons known and unknown. There is also probable cause to search the SUBJECT PREMISES described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## **IDENTIFICATION OF PROPERTY TO BE SEARCHED**

9.      The premises to be searched is 446 West Main Street in Monroe, Maine, including the residence, outbuildings, curtilage, attic, basement, vehicles, trash and recycling receptacles, as well as all common areas and contiguous property that makes up the SUBJECT PREMISES. The premises to be searched also includes the person of Frazer and Murphy if they are located on the SUBJECT PREMISES at the time the search warrant is executed.

10.     As of June 14, 2023, a query of the Accurint information database (a public records database—which has proven reliable in previous investigations—that provides names, dates of birth, addresses, associates, telephone numbers, email addresses, etc.) for Frazer shows his address as the SUBJECT PREMISES.

11.     Records from the Town of Monroe, Maine Assessor's Office show Frazer to be an owner of record for the SUBJECT PREMISES. Those records list Frazer as the co-owner of a 46-acre property identified as parcel 009-009.[1] The parcel is recorded by the Assessor's Office as Account #237, 009-009/B2936P85.

| 237 | FRAZER, DAVID & DONNA | 33,570 | 53,314 | 0 | 86,884 | 1,737.68 |
| | 9941 BELL ROAD | Acres    46.00 | | | | |
| | Newbury  OH 44065 | | | | | 868.84 (1) |
| | | | | | | 868.84 (2) |
| | 446 WEST MAIN ST | | | | | |
| | 009-009 | | | | | |
| | B2936P85 | | | | | |

12.     A query of Maine Bureau of Motor Vehicles automated records indicates that Frazer possesses an active driver's license issued on January 9, 2023, with an address of the SUBJECT PREMISES.

13.     Based upon my observations and available information, I know the SUBJECT PREMISES to include a grey-colored residence/structure with light-colored window trim and rear decking attached to that structure. A red barn-type structure is located adjected to the residence. The residence and barn-type structure are located at the end of a driveway. The SUBJECT PREMISES also includes several outbuildings located on the property.

---

[1] I was unable to locate 009-009 on a publicly available parcel map. Though I have not able to confirm, it is possible that the 46-acre parcel was subdivided into smaller parcels.

14.     The SUBJECT PREMISES is further described in **Attachment A,** which is incorporated herein by reference.

## **IDENTIFICATION OF PROPERTY TO BE SEIZED**

15.     The property described in **Attachment B**, which is incorporated herein by reference.

## **STATUTORY BACKGROUND**

16.     The federal Animal Welfare Act ("AWA") sets general standards for humane care and treatment that must be provided for certain animals. Congress assigned the U.S. Department of Agriculture with the responsibility for enforcing the AWA. The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b).

17.     The Animal Welfare Act also makes it a crime to knowingly use the mail or any instrumentality of interstate commerce for commercial speech for advertising a fighting animal, or promoting or furthering an animal fighting venture. 7 U.S.C. § 2156(c). All of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(i); 18 U.S.C. § 49.

18.     Additionally, it is unlawful for any person to knowingly attend an animal fighting venture or knowingly cause an individual who has not attained the age of 16 to attend an animal fighting venture. 7 U.S.C. § 2156(a)(2); 18 U.S.C. § 49.

19.     The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that, "[t]he Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section . . . ." 7 U.S.C. § 2156(e).

20.     Pursuant to the Animal Welfare Act, "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e). Further, "[a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found . . . ." *Id.*

## FACTS SUPPORTING PROBABLE CAUSE

### Background Information

21.     The statements in this section are based on my training and personal experience investigating animal fighting ventures, and on information provided to me by other law enforcement personnel.

22.     In the United States, dogfighting ventures involve dogs including "pit bull"-type dogs, which dogfighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dogfight occurs when two

dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when a dog kills the other dog or both dogs die. Winners of dog fights may receive financial awards. Betting is also common at dog fights.

23.     Organized dogfights often occur in a low-walled, rectangular, or square enclosures referred to as a "pit" or "box." Alternatively, the walls of the corner of a room or basement can serve as an improvised pit. The "pit" serves to keep the fighting dogs confined while engaged in the fight. The wall components and flooring in and around a dogfighting pit will contain blood, fur, and other animal matter because of the nature of dogfighting. The clothing worn by owners and handlers of a dog in a dogfight as well as any implements including break sticks (parting sticks) will likely contact blood and other bodily fluid of dogs because of injuries sustained during a dogfight. Dogfighting pits often use carpeting as a floor within the enclosure to provide traction for the fighting dogs and to absorb blood from injuries sustained during the fight.

24.     Because of their conditioning and training, dogs used in animal fighting ventures are typically housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains, also known as logger chains, are often used when restraining dogs for the dual purposes of controlling the strong animals and developing strength to prepare for fighting.

25.     Dogfighters may fight dogs with a goal of obtaining "Champion" ("Ch") or "Grand Champion" ("Gr Ch") status for their dogs which is achieved by winning three or five fights respectively. Dogfighters may maintain contact with other dogfighters around

the country and can generate substantial income from gambling on dogfights and from the sale and breeding of fighting animals.

26.     Dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs until the death; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dogfighters such as the individuals described in this affidavit often keep such dogs for the purposes of furthering animal fighting ventures and solely for fighting purposes.

27.     The most common way that a dogfighter tests a particular dog to ascertain whether the dog is "game" is to "roll" or "bump" the dog. A "roll" is a dog fight conducted for purposes of "game-testing" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs. "Rolls" are sometimes referred to as "bumps."

28.     Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight. Dogfighters refer to dogs who do not demonstrate fighting instinct by the time they reach maturity as "cold" or "shy." Because such dogs have no value to a dog fighting operation, they are often culled, to use a word employed by dog fighters. To avoid public scrutiny, dogfighters typically do not sell these dogs to non-dogfighters or take

them to an animal shelter. "Culling" generally results in the death of these animals. Federal agents are aware of dogfighting targets and defendants having killed dogs by shooting them, strangling them, bludgeoning them, or drowning them. Dogfighters often bury or otherwise discard the carcasses of culled dogs. Additionally, dogs killed in a dogfight are also often buried or otherwise discarded; forensic examination of these carcasses may provide information relative to the cause of death based on injuries and other physical evidence.

29.     Those involved in training and exhibiting fighting dogs commonly possess several dogs at one time for several reasons. Dogfighters maintain a stock of dogs at different weights and of both sexes because in dogfights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent. Dogfighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dogfighting bloodline.

30.     Those who breed dogs for animal fighting ventures often use and possess "breeding stands," which are devices used to immobilize a female dog for breeding when the female dog is too dog-aggressive to mate naturally. Such devices are used exclusively to breed fighting dogs, as legitimate breeders would no choose to breed a dog who was too aggressive to mate naturally. Such a piece of equipment would likely be found in an indoor area to avoid weather damage.

31.     Further, dogfighters may possess an inventory of dogs because dogs often die or are badly injured during fights. Dogfighters commonly store dog semen in frozen

form to later use in breeding. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dogfighters also routinely test and evaluate ("roll") their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

32.     Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

33.     Dogfights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match," "fight," or "show." Dogfights may be organized under the cover of a "weight pulling competition." The owners or handlers typically agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective owners or handlers.

34.     It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year and for a wager that is mutually agreeable to both parties. For that reason, dogfighters often rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dogfighters often "call

out a weight" to known dogfighters in several states to increase their odds of finding a match. "Calling out a weight" may be accomplished by telephone, text message, e-mail, or other electronic communication including social media platforms like Facebook.

35.    Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills, "slat mills," "carpet mills," "cat mills," "jenny mills," and exercise wheels used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; hides or other material used as hanging devices to strengthen or condition dogs; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, vitamins, and other medicine. Some of the illegal and legal drugs used include steroids to build muscle mass and aggression. Dogfighters also often use "break sticks" to separate fighting dogs at pe-determined intervals during a dogfight.

36.    Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dogfighter's "dog yard" or indoors away from public view, often in a basement.

37.    Although dogs used for fighting are often housed outside in many parts of the country, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from

becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dogfighter does not have another location to keep them or wants to keep them out of view. Urban, suburban, or otherwise densely populated areas provide an additional reason for dogfighters to house dogs inside structures or residences to limit visibility of their activities.

38.     Dogfighters sometimes breed their own fighting dogs from dogs they already own, and sometimes buy fighting dogs from other dogfighters, either as adult dogs or puppies. When dogfighters acquire dogs from other dogfighters, they sometimes do so in order to integrate desired fighting traits or "bloodlines" from other dogfighters into their own stock.

39.     Some dogfighters are selective about who they will sell fighting dogs to because the success of that dog in the fighting ring will reflect on the seller whose bloodline is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dog fights) is bestowed the "Register of Merit" ("ROM") title. This provides incentive to the seller to sell dogs to capable dogfighters, with the intention that the dogs will be fought.

40.     Commonly, those operating or participating in dogfighting ventures maintain pedigrees, books, records, ledgers, and journals relating to the possession, purchase, transportation, sale, breeding, and training of fighting dogs. These materials exist in both hard and electronic copy and are frequently transmitted through the

Internet on websites, forums, email, and social media. The "pedigree" of a fighting dog frequently shows the dog's name, with reference to the dogfighting "kennel" from which the dog comes, as well as breeding lineage going back multiple generations, with reference to the number of fights won by the dog and its predecessors. Pedigrees are important in the dogfighting "industry" because they allow dogfighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits.

41.    Historically, "underground" dogfighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dogfighters post pedigrees to demonstrate the fighting lineage of their dogs. Dogfighters also often maintain detailed ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

42.    Dog fighting is frequently an international venture, with participants traveling from all over the world to some fighting events. Because participants may be geographically scattered, they often communicate through electronic means. Dogfighters today tend to communicate with each other via text messages, social media like Facebook, email, or website chat rooms dedicated to "game dogs." Dogfighters routinely "hook" matches and exchange documents, expertise, photographs, or videos relating to dogfighting activities via email and other electronic means. Social media

offers individuals who engage in animal fighting the ability to communicate using text messages and audio calls, transmit and receive pictures and videos of animal fighting, and establish and widen animal fighting networks. Public and private Facebook groups dedicated to dogfighting exist. Dogfighters exchange photographs and videos of dogs, for example, to demonstrate a dog's conformation or build, gameness, and other fighting qualities, when soliciting or advertising a dog for purposes of breeding, buying, or arranging a fight.

43.     People who engage in dog fights commonly maintain records that reflect names, addresses, and/or telephone numbers of their associates in their cellular phones or electronic address books.

44.     Dogfighters also post dog pedigrees on the website http://www.apbt.online-pedigrees.com, known as "Peds Online" or "Online Peds." Dogfighters use this as a repository for breeding information to prove and verify the lineage of their dogs or dogs they are fighting against or considering buying or for breeding purposes. The pedigree for each dog contains: an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their bloodline have won. There is also a field for "Breeder" and "Owner." Some pedigrees have pictures of the dogs. Each pedigree has a unique six-digit number that appears in the webpage internet address for that particular pedigree. Dog fighters transmit hyperlinks to these fighting dog pedigrees by e-mail, text message, and social media.

45.     "Peds Online" subscribers create a user account by providing an email address. It is my understanding that a user who signs up for an account would typically receive confirmation and notifications via email.

46.     The transportation of dogs possessed, bought, and sold for the purpose of dogfighting serves an important role in the dogfighting industry based on the geographic dispersion of dogfighting across the United States and the world. Individuals referred to as "transporters" are employed to convey dogs to and from subjects in different physical locations. "Transporters" often use vans or trucks to move dogs across the country and beyond.

<u>Investigation Regarding John Murphy</u>

47.     The United States is conducting a criminal investigation of John Murphy, a resident of Hanson, Massachusetts, and others—including David Frazer—for federal offenses related to dogfighting. Based on my investigation, I believe that Murphy fights dogs as well as transports, trains, breeds, possesses, receives, and sells dogs for participation in animal fighting ventures from his Massachusetts residence and elsewhere (including the State of Maine). I also believe Murphy has conspired with Frazer of Monroe, Maine and others (known and unknown) to do the same.

48.     A query of the Accurint information database for Murphy shows his address as 944 East Washington Street, Hanson, Massachusetts ("HANSON PREMISES"). Massachusetts Registry of Motor Vehicles ("RMV") records  showed  that Murphy  possesses  an  active Massachusetts  driver's  license  with  a  residential  and mailing  address  of  the  HANSON PREMISES.  RMV records also indicated that Murphy has a 2021 Mercedes-Benz GLC (Massachusetts registration 4VKP49)

registered in his name at the HANSON PREMISES. Records from the Town of Hanson Assessor's Office showed Murphy and another individual as the owners of the HANSON PREMISES.

49.    During the investigation, law enforcement identified two Facebook accounts associated with Murphy under the usernames "John Mac Murchaidha" and "Séamus Sugar." Murphy, identified by his Massachusetts driver's license photograph, is depicted regularly in photos posted to both accounts. The "John Mac Murchaidha" account subscriber information listed a recovery email address of "jmurphy@brandonschool.org" and a user date of birth matching the date of birth for Murphy. The "Séamus Sugar" account subscriber information listed a phone number ((774) 452-5000) identified as associated with Murphy and a user date of birth matching the date of birth for Murphy. Both accounts were active as of March 2023.

50.    On May 27, 2022, the United States District Court for the District of Massachusetts issued search warrants for both Facebook accounts. The records produced by Facebook in response to those warrants contain evidence of Murphy's involvement in dogfighting. Further, Murphy identified the HANSON RESIDENCE as his address in Facebook Messenger messages within the account.

51.    Starting in approximately 2012, Murphy began posting content related to pit bull-type dogs on his "John Mac Murchaidha" account. In October 2012, Murphy posted a picture of himself with a pit bull-type dog that he identifies in a comment as "a very famous dog" and "valuable and historic to the breed:"



52.     In April 2022, photos posted on the "John Mac Murchaidha" account displayed pit bull-type dogs, as well as references for "game dogs" and images depicting two pit bull-type dogs facing each other in apparent preparation to fight.

53.     Murphy, through his "Séamus Sugar" account, belonged to a private Facebook Group titled "Scratch Dog Journal" that I know was used by dogfighters to share the results of dogfights, buy and sell dogs for dogfighting, exchange information on training and conditioning dogs for dogfighting, and engage in other dogfighting-related activities.

54.     In May 2021, the "Séamus Sugar" account posted a picture on Facebook of a pit bull-type dog wearing an unusually thick collar with the caption of "Ch zorro" and a link to the pedigree information of the dog. The background of the picture shows another pit bull-type dog wearing an unusually thick collar that appears to be chained to a fixed point between two structures that I believe are doghouses. Based on my training and experience, I know that dogfighters often place thick and/or heavy collars on dogs for the dual purposes of controlling the strong animals and developing  strength  to

prepare for fighting. Dogfighters use "Ch" to identify a dog as a "Champion" or a

dog that won at least three dogfights. The screenshot below shows the picture posted to

Scratch Dog Journal from the "Séamus Sugar" account at a location I know now to be

the HANSON PREMISES based on my physical presence at the location in June 2023.



55.     In April 2022, the "Séamus Sugar" account posted the following

announcement stating that he was considering "offering 1 or 2 pups to the public both

parents are fine representation of everything that encompasses a bulldog." Dogfighters

commonly refer to pit bull-type dogs as "bulldogs." The post references "rom."  As

noted previously, a dog that produces multiple offspring that achieve "Champion"

status (i.e., winning three or more dog fights) is bestowed the "Register of Merit" or

"R.O.M." title. This provides incentive to the seller to sell dogs to capable dogfighters,

with the intention that the dogs will be fought. A screenshot of the post appears below.



56.    A review of Murphy's "Séamus Sugar" Facebook account revealed photographs and videos that are believed to be related to dogfighting ventures over multiple years. The account contains a photograph from the May/June 2004 issue of the dogfighting magazine, *Sporting Dog Journal*. The photographs show records concerning frozen semen storage for specific dogs named "Sismo" and "Alpo". One photograph shows a pit bull-type dog restrained in a breeding stand. Another photograph shows Murphy shaking hands with a "legendary" suspected dogfighter from Louisiana. Photographs show images of multiple veterinary supplements including "BOLDERONE 200" which is an anabolic androgenic steroid.

57.    The following photograph, posted to the "Séamus Sugar" account in 2018, shows a pit bull-type dog with discolorations on its head and front left leg consistent with the scarring of skin. Pit bull-type dogs that survive dogfights often sustain wounds to their body which may heal and scar:



58.    The following photograph, posted in 2018 to the "Séamus Sugar" account, shows Murphy handling a pit bull-type dog:



59.    Videos posted to the "Séamus Sugar" account on March 3, 2021, May 13, 2019, and February 18, 2020, depicted pit bull-type dogs physically tethered to three different carpet/slat mills (i.e. treadmill-like devices that dogfighters commonly use to physically condition dogs for dogfights). One of the videos depicted an apparently live raccoon caged in front of the carpet mill, presumably to serve as a stimulus for the pit bull-type dog.  Screenshots from the three videos are included below:



60.     Text and audio messages in the "Séamus Sugar" account contained content that I believe involved dogfighting and breeding pit bull-type dogs for the purpose of fighting.  For example, on June 3, 2019, Murphy discussed breeding and purchasing dogs with another subject under investigation. Murphy claimed that he "champed out more dogs in the last 4 years than this guy can name from and old SDJ [likely, *Sporting Dog Journal*] mag lol." I believe Murphy's statement to be a reference to a "champion" dog winning three dogfights.

61.     On April 8, 2022, Murphy discussed suspected dogfighting with the Facebook account of "John Jacob Jinglehimer":



62.     Additional messages sent to "John Jacob Jinglehimer" on April 8, 2022,

included the following voice messages from Murphy:

    a.   "Alpo beat him for number four and had him out of there in fifteen minutes. Got rid of him. Right there. Left him there."

    b.   "Those were some badass dogs. Blondie, Miss Blondie and her brother. and all that stuff off Champion Mike. Those were some badass dogs. Me and Joel took a male off Champion Twist and Hersey into Blondie's littermate brother and we lost in three-ten, man. It was a fucking battle, like, from Seattle."

63.     I conducted subsequent open-source reviews of the Facebook accounts belonging to Murphy. In January 2023, the "Séamus Sugar" Facebook account posted the following in a suspected dogfighting Facebook group titled "Gr Ch Alpo/Gr Ch Mayday/Gr Ch Machobuck". I am aware of Murphy detailing a suspected dogfight involving "Alpo" in Facebook Messenger conversations in 2022 from the previous Facebook search warrant for the account.



64.     On April 26, 2023, the Honorable U.S. Magistrate Judge Karen Frink Wolf for the District of Maine granted a search warrant for the Google Account of Jermaine Faulk (FAULKJERMAINE72@GMAIL.COM) ("the Google Account"). Faulk, a resident of East Baldwin, Maine, is another subject of the current investigation.[2]

65.     I am still in the process of reviewing the content of the Google Account produced pursuant to the search warrant. In my initial review of the Google Account, I observed a significant amount of content—in the form of photographs and videos— depicting dogs fighting in apparent dogfighting events, dogs fighting in apparent training contents ("bumps" or "rolls"), and dogs with gruesome and macabre injuries including a dog eating the face of another dog.

66.     In my review of the Google Account, I also located two videos (one 59 seconds long, one 1 minute and 25 seconds long) that show a white male adult wearing blue denim overalls encouraging a dog to fight another dog in an apparent dogfighting pit. I believe the male in the blue denim overalls to be Murphy.[3] Screenshots from each video, which I believe depict the same dogfight that occurred on or about October 1, 2017, appear below.

---

[2] On June 7, 2023, federal agents and state troopers executed a federal search warrant at Faulk's residence. Pursuant to the warrant, agents seized 16 pit bull-type dogs and various additional items—for example, a weighted collar, two treadmills, break sticks, and papers regarding frozen canine sperm—constituting evidence of federal offenses related to dogfighting. On that date, Faulk denied being a dogfighter. Faulk's significant other, who also resided at the residence, denied she or Faulk were involved in dogfighting.

[3] My belief is based on my face-to-face interaction with Murphy on June 7, 2023, the comparison of the "sleeve" tattoos on both of the male's arms in the videos with the tattoos that I observed and documented on both of Murphy's arms on June 7, 2023, my recognition of Murphy's voice from speaking with him in person, and my review of the photograph associated with the Massachusetts driver's license issued to Murphy.



<u>Surveillance of Murphy's Residence (HANSON PREMISES)</u>

67.     Between August 2022 and June 2023, investigators observed a white male adult believed to be Murphy (based on his approximate height, physical build, hairstyle, and tattoos) at the HANSON PREMISES.[4] The image below shows a white male adult believed to be Murphy at the HANSON PREMISES handling a pit bull-type dog on March 7, 2023:



---

[4] During the investigation in Massachusetts, law enforcement utilized a pole camera near the HANSON PREMISES. The observations referenced in paragraphs 66 to 71 of this affidavit are based on review of pole-camera video footage that I conducted and/or that was conducted by other investigators. The still images contained in paragraphs 66, 67, 69, and 70 were taken from that video footage.

68.     During each month from August 2022 through May 2023, investigators documented pit bull-type dogs present at the HANSON PREMISES. Frequently, investigators observed dogs exit the side door of the HANSON PREMISES nearest to the driveway.  The image below shows a white female adult—believed to be the other owner of the HANSON PREMISES—handling a pit bull-type dog at the HANSON PREMISES on March 8, 2023:



69.     On March 14, 2023, Town of Hanson Animal Control Officer Joseph Kenney ("ACO Kenney") responded to a citizen report of a "dog tethered outside" the  HANSON PREMISES.[5]  ACO Kenney met with Murphy at the HANSON PREMISES.  ACO Kenney reported a "red colored American bully tethered in the back side yard with a raised dog house" and "what looked to be 2-3 small kennel runs set up behind a stockade fence" at the HANSON PREMISES. ACO Kenney also reported a "young pit type puppy" inside the HANSON PREMISES. Murphy

_____

[5] I understand that Massachusetts law prohibits the chaining or tethering of a dog "for longer than 5 hours in a 24-hour period and outside from 10:00 p.m. to 6:00 a.m., unless the tethering is not for more than 15 minutes and the dog is not left unattended by the owner, guardian, or keeper."

provided a business card (depicted below) to ACO Kenney that listed "(774) 452-5000)" under the name "John Murphy."



70.     On May 20, 2023, investigators observed a pit bull-type dog present at the HANSON PREMISES:



71.     On June 3, 2023, at 11:08 a.m., the pole camera documented a male—who I believe to be Murphy—load a pit bull-type dog into an animal transport crate in the cargo area of a grey Jeep Cherokee parked in the driveway of the HANSON PREMISES.

The images below show the male loading an animal transport crate into the Jeep Cherokee (left) and carrying a pit bull-type dog (right). The Jeep Cherokee departed the driveway of the residence at approximately at 11:11 am.

 

72.    On June 4, 2023 at 12:26 a.m.—approximately 13 hours later—the pole camera captured a vehicle that I believe to be the Jeep Cherokee returning to the HANSON PREMISES and parking in the driveway. A male who I believe to be Murphy exited the vehicle and entered the residence. I did not observe a dog or animal transport crate exit the vehicle or otherwise present and visible upon the return of the Jeep Cherokee to the HANSON PREMISES.

73.    On May 22, 2023, the Honorable U.S. Magistrate Judge David Hennessey for the District of Massachusetts granted an order authorizing the installation and use of a pen register and trap and trace device on the Verizon Wireless cellular phone assigned phone number (774) 452-5000, which has been identified as being used by Murphy.

74.     According to records from Verizon Wireless, Murphy—using the number (774) 452-5000—texted the telephone number (207) 930-0401 at 9:15 a.m., 9:15 a.m., and 11:43 a.m. on June 3, 2023.

75.     According to the Accurint database, Donna Frazer is the possible subscriber for UScellular telephone number (207) 930-0401, with the SUBJECT PREMISES as her associated address. As referenced in paragraph 11, Donna Frazer is listed as an owner of the SUBJECT PREMISES.

76.     Additionally, a search of a commercially available insurance database showed a "Property/Casualty Claim" was submitted in February 2018 on a personal automobile policy related to a traffic collision involving David Frazer. Within the insurance claim, David Frazer was listed as an insured driver and involved party and the record listed his cellular telephone as (207) 930-0401.

<u>Search of the HANSON PREMISES</u>

77.     On June 2, 2023, the Honorable U.S. Magistrate Judge David Hennessey for the District of Massachusetts granted a search warrant for the HANSON PREMISES.

78.     On June 7, 2023, federal agents and state troopers executed the federal search warrant at the HANSON PREMISES resulting in the seizure of 9 pit bull-type dogs, blue denim overalls, electronic devices, and a significant quantity of additional evidence of federal offenses related to dogfighting. The additional evidence of such offenses included, among other things, skin staplers, intravenous solution bags with lines and needles, break sticks with suspected blood in marring on the surface of the

implements, suspected steroids, dogfighting literature, and dog training equipment. Investigators also located firearms and suspected controlled substances.

79.    Pursuant to the federal search warrant, I searched the cellular telephone of Murphy, a Samsung SM-G970U (IMEI: 352066104155838), that I located in the master bedroom of the HANSON PREMISES. The Samsung SM-G970U that I searched is associated with/uses telephone number (774) 452-5000. The cellular telephone contained multiple dogfighting videos as well as significant content related to dogfighting generally. Specifically, I reviewed a 2-minute-and-10-second video of a white male adult—who I believe to be Murphy—wearing blue coveralls encouraging a dog to fight another dog in an apparent dogfighting pit.[6] A screenshot from the video, which I believe depicts a dog fight that occurred on or about December 7, 2017, appears below.



---

[6] My belief is based on my face-to-face interaction with Murphy on June 7, 2023, my recognition of Murphy's voice from speaking with him in person, my review of the photograph associated with the Massachusetts driver's license issued to Murphy, and the discovery of the video on a cellular phone used by Murphy.

80.     During my search of the same cellular telephone, I located a text message conversation between Murphy and telephone number (207) 930-0401. Murphy saved the contact associated with that telephone number as "Dave Frasier Maine."

81.     I reviewed the conversation between Murphy and "Dave Frasier Maine" that occurred between September 27, 2019, and June 3, 2023.

   a.   The conversation involved the discussion of dozens of dog pedigrees, references to suspected dogfight performance and results, numerous pictures of pit bull-type dogs housed in a manner consistent with dogs possessed for the purpose of dogfighting, and two separate news-article links regarding dogfighting-related law enforcement operations. Additionally, Murphy stated "the feds" arrested his friend in a conversation regarding dogs and the avoidance of "unwanted attention" in a message sent on November 3, 2019.

   b.   It appears that Murphy and Frazer exchanged pedigree links via text messages over forty times. Frazer both sent and received pedigree links.

   c.   As an example of their communications, Murphy sent a message to "Dave Frasier Maine" on May 28, 2023, stating, "I'm gonna make 1 of those sheezy dogs a champion for you. Watch." Based on my training and experience, I believe Murphy stated his intent to train to one of Frazer's dogs to prepare for dogfights as well as handle dog(s) in dogfight(s) to achieve three or more wins over other dogs earning the title of "champion."

d.   On June 3, 2023, Murphy sent a message to "Dave Frasier Maine" stating, "Gonna head up shorly." Murphy additionally stated, "Got an old gal with me shes 10. Gonna put her up till she comes in heat". Murphy sent a final message stating, "On way". The term "heat" likely refers to the ability of a female dog to accept a male dog for the purpose of conceiving. Based on my training and experience and the context of the conversation, I believe Murphy was informing "Dave Frasier Maine" that he was bringing a 10-year-old dog to "Dave Frasier Maine" to be housed until she was in heat. "Dave Frasier Maine" responded to Murphy stating, "OK. Can we hit TSC while you're here? Getting low on supplies . . . ." In this context, I believe "TSC" means Tractor Supply Company, a chain of retail stores that sells animal products including pet food.

82.   In my review of Murphy's cellular telephone, I determined that the user of the phone had searched for the address of the SUBJECT PREMISES in the Waze app on multiple dates including June 3, 2023. Based on my experience and research, I am aware that Waze is satellite navigation software application on smartphones and other electronic devices that relies on the Global Positioning System (GPS) to provide users with turn-by-turn directions to a selected destination.

83.   In my review of Murphy's cellular telephone, I determined that the user of the phone had also searched for the address of the SUBJECT PREMISES in the Waze app on August 31, 2020, December 17, 2022, March 18, 2023, and April 22, 2023.

84.   Based on my training and experience and my review of the information contained in Murphy's cellular telephone, I believe that Frazer and Murphy have

significant connections surrounding their involvement in dogfighting. For example, based upon Murphy's June 3rd message about bringing "an old gal" up until she was in heat and Frazer's affirmative response and request to go to "TSC" while Murphy was "here" because he was "[g]etting low on supplies," I believe Frazer may be presently housing one or more of Murphy's dogs at the SUBJECT PREMISES.

Review of Frazer's Facebook Account

85.     A Facebook account for Frazer exists with a URL of https://www.facebook.com/david.frazer.73 and a display name of "David Frazer" (the "Facebook Account"). Portions of the content generated by the user of the Facebook Account are accessible to the public. I identified Frazer as the account holder by comparing photographs posted by the Account to the image associated with his Maine driver's license.

a.   On June 25, 2020, the Facebook Account posted the following image I believe was taken at the SUBJECT PREMISES.



b.   On August 25, 2020, the Facebook Account posted the following image I
believe was taken at the SUBJECT PREMISES.



c.   On January 22, 2020, the Facebook Account posted the following image I
believe was taken at the SUBJECT PREMISES.



86.      On July 17, 2020, the Facebook Account posted an image of pit bull-type dog at location I know to be the HANSON PREMISES because I was physically present at the location where the picture was taken on June 7, 2023. The Facebook Account made a comment on the post stating, "belongs to a friend. Looking to breed him to my mature Sarona gyp real soon." A screenshot of the post from July 17, 2020, appears below.



87.      On May 20, 2023, the Facebook Account posted a picture of a pit bull-type dog tethered to a logger chain attached to a collar with heavy-duty hardware consistent

with the outdoor housing of dogs possessed for the purpose of dogfighting. The picture from the post appears below.



88.    On May 31, 2023, the Facebook Account posted a picture of pit bull-type dog. The picture from the post appears below.



<u>Surveillance of the SUBJECT PREMISES</u>

89.     A Google Earth satellite image with an imagery date of May 11, 2018, is available for the SUBJECT PREMISES.[7] The publicly available satellite image shows objects of the appropriate size, color, shape, and spacing of dog houses used to house dogs for the purpose of dogfighting.[8] The Google Earth image of the SUBJECT PREMISES appears below (emphasis added with yellow circles).

---

[7] Based on my training and experience, I am aware that satellite images available on Google Earth often may not capture individual animals at a given location. However, Google Earth images can be helpful in identifying kennels and outbuildings, large dogfighting equipment like a "cat mill" or a turntable, and "chain spots."

[8] Dogs used in dogfighting ventures are aggressive towards other dogs. For this reason, they must be housed separately in a way where unintended fighting cannot occur.



90.     On June 16, 2023, Lieutenant Randall Keaten of the Maine State Police

Major Crimes Unit conducted surveillance at the SUBJECT PREMISES. Lieutenant

Keaten reported hearing sounds that he believed to be dogs barking at the SUBJECT

PREMISES.

91.     On June 16, 2023, Trooper Gregory Tirado of the Maine State Police Air

Wing conducted aerial surveillance of the SUBJECT PREMISES. During the overflight,

Trooper Tirado photographed dogs that appeared to be housed in a manner consistent

with possession for the purpose of dogfighting. Multiple dogs are visible in the

photographs. The suspected dog houses are encircled by round-shaped patterns of bare

ground commonly known as "chain spots." Based on my training and experience, I am

aware that such "chain spots" are frequently created when a pit bull-type dog chained to

a fixed point with heavy logger chains wears away surface vegetation within the range of

the chain length. The photograph below shows at least three suspected doghouses with encircling "chain spots" (emphasis added with a red arrows).



92.    An additional photograph from the June 16, 2023 overflight by Maine State Police appears below. Based on my training and experience, I believe this photograph shows three pit bull-type dogs. I believe these objects are dogs based on their proximity to suspected dog housing, the manner of housing (separation), and their apparent size, shape, and color. The suspected pit bull type-dogs in the picture below are emphasized with yellow arrows.



The following additional images show micro views of suspected pit bull-type dogs (emphasis added with black arrows).



Additional Information Regarding Probable Cause

93.     There is probable cause to believe that the items in Attachment B will continue to be found at the SUBJECT PREMISES. First, with respect to the dogs themselves, dog fighters are known to maintain successful or high-potential fighting dogs long periods of time so that they can continue to profit off of those dogs from future dog fights or from selling offspring or breeding rights. The more fights a dog wins, the higher that dog's value, for either offspring, breeding, or sale to another dogfighter.

94.     As noted above, dogfighters will actively condition a dog for approximately eight weeks in between "hooking" a match and the fight itself. Following a match, if the dog survives, the handler will typically allow the dog several months to recover from injury, before re-assessing that dog's fighting fitness and hooking him or her for the next match. It would not be uncommon for a dog fighter to match (fight) a particular dog no more than once every nine to twelve months. Thus, the active career of a successful fighting dog could span several years, during which time the dog would remain in the owner's custody.

95.     By way of example, I am aware that agents in a separate investigation obtained evidence in a criminal investigation showing that one convicted defendant had raised a particular fighting dog named "Momba" from birth, matched her multiple times, and continued to breed her until she was nearly eleven years old, at which point she was seized as part of the investigation.

96.     Further, as noted above, dogfighters typically keep a "yard" housing several to many fighting dogs, so that they can have different weights, sexes, fighting

abilities, and recovery cycles (dogs in different stages of recovery from previous fights) to choose from when seeking or agreeing to "hook" a match. Thus, even though any particular dog may have since been killed or traded since the government's last surveillance and/or social media posting, there is probable cause to believe that multiple fighting dogs will continue to be found at the SUBJECT PREMISES.

97.     Relatedly, developing and proving a fighting dog's "bloodline" or breeding lineage is of great importance to dogfighters, for several reasons, including: to track the dogfighting "wins" of a dog and its predecessors, to ascertain whether certain fighting traits or physical characteristics were passed on or likely to be passed on, to show that a dog's predecessors were proven fighting dogs or bred by notable dogfighters, and to provide provenance that affects the market value of a dog for sale, breeding, or wagering on dogfights.

98.     It can take years or even decades of continuous possession of fighting dogs for a dogfighter to fully develop a fighting "bloodline" to his or her satisfaction. I am aware that the government has prosecuted multiple dogfighters who were involved in the illegal industry for decades before their activities became known to law enforcement. For that additional reason, there is probable cause to believe that multiple fighting dogs will continue to be found at the SUBJECT PREMISES.

99.     There is likewise probable cause to believe that dead dogs may be found at the SUBJECT PREMISES. In selecting which dogs from a dogfighter's stock are ready to fight, and as part of their selective breeding programs to develop the most dog-aggressive dogs, dogfighters frequently "cull" underperforming dogs.

100.    As noted above, probable cause exists to believe Frazer and Murphy possess—or have possessed—dogs for the purpose of dogfighting. In order to train and test such dogs, "roll" or "bump" fights are sometimes conducted in an enclosed fighting pit or improvised enclosed area similar to that which would be used for a contract match. There is thus probable cause to believe that components of a fighting pit, including materials that may contain blood evidence, will be found at indoor and outdoor locations at the SUBJECT PREMISES. Based on previous dog fighting investigations, such materials can often be found in sheds, garages, and outbuildings. As noted above, such forensic evidence can be detected years after it is originally created.

101.    There is likewise probable cause to believe that the dogfighting equipment, documents, and other physical evidence will continue to be found at the SUBJECT PREMISES. As noted above, such items are integral to the ongoing maintenance, training, and fighting of a yard of fighting dogs. Certain items, such as a hanging scale, slatmill, or flirt pole, would receive daily or near-daily ongoing use and are routinely found in the immediate vicinity of the dogs or in a residence on the property.

102.    Additionally, some of these items, such as a jenny mill or a "cat mill," or the heavy chains to which many fighting dogs are affixed (with a buried car axle on the other end), are far too large, heavy, and/or difficult to move, conceal, or dismantle. Others, like a slatmill, represent a significant monetary investment by the owner, and are not lightly parted with. Once obtained, it is common for dogfighters to continue to maintain and use such items until they have reached the end of their service life or are seized.

103.   As noted above, in order to maintain a stock of fighting dogs, individuals involved in dogfighting like Murphy and Frazer typically use specialized equipment, as well as veterinary drugs and supplements, to train and prepare dogs for fighting and to treat dogs that are injured in the course of training or matches. Since Frazer continues to house dogs for use in dogfighting, there is probable cause to believe Frazer maintains such equipment inside the residence or outbuildings at the SUBJECT PREMISES.

104.   Dogfighting papers and books – and in particular fighting dog "pedigrees" or underground "registry" documents – are also likely to continue to be found at the SUBJECT PREMISES. As noted above, the information on a fighting dog's pedigree is invaluable to a dogfighter, and in some instances represents and documents years or even decades worth of that person's "achievement" in developing a fighting dog program or "bloodline." It is essential for dogfighters to have this information readily available, both as reference material to guide future breeding and fighting plans, and as documentation to prove the fighting provenance of dogs intended to fought, bred, or both.

105.   Agents routinely seize such papers when executing search warrants in dogfighting investigations, and sometimes they are decades old, showing continuous ongoing possession of both the papers and the dogs identified in the bloodline of such documents. For example, I seized pedigree papers from the HANSON PREMISES during the June 7, 2023 execution of the federal search warrant that dated back to the 1990's.

106.   I believe probable cause exists to search vehicles registered to or operated by Frazer and/or Murphy if they are present on the SUBJECT PREMISES at the time of

the execution of the search warrant. Based upon my training and experience, I am aware that those engaged in dogfighting ventures frequently use their personal vehicles to transport dogs for various purposes, including to "rolls"/"bumps" and contract matches. I know that instrumentalities such as leashes and restraints are frequently located in such vehicles. Additionally, dogfighting papers, books, documents, and records can be—and frequently are—possessed on electronic devices and electronic storage media as discussed below. I am aware that those engaged in animal fighting ventures—like individuals who are not engaged in such ventures—frequently carry electronic devices and electronic storage media like cellular phones on their persons and in their vehicles.

107.    For the same reason—that individuals frequently possess and carry their electronic devices and electronic storage media like cellular phones—there is probable cause to search Frazer person and/or Murphy's person if they are located on the SUBJECT PREMISES at the time the warrant is executed. Based on the investigation to date and the information discussed above, I believe that Frazer and Murphy communicate, at least in part, by cellular telephone. Given the evidence that Frazer and Murphy regularly utilize their Facebook accounts and have exchanged text messages, there is reason to believe that Frazer and Murphy regularly carry and use cellular phones, and that those devices contain evidence of, and are instrumentalities of, the SUBJECT OFFENSES. If Frazer and/or Murphy are present on the SUBJECT PREMISES at the time the search warrant is executed, a search of their persons would permit the seizure of their cellular phones and prevent Frazer and/or Murphy from secreting any evidence located at the SUBJECT PREMISES on their persons.

Seizure of Electronic Devices and Electronic Storage Media

108.    Dogfighting papers, books, documents and records can be—and frequently are—created, possessed, maintained, stored, sent, received, traded, and exchanged electronically on electronic devices and electronic storage media including computers, cellular telephones, and tablets. Such devices are also—depending on their make, model, and operating system—capable of taking, saving/storing, sending, and receiving photographs and videos, data, voice messages, text messages, e-mails, and other communications via messaging applications.

109.    In my training and experience, I know that individuals involved in dogfighting communicate with others regarding the possession and sale of dogs for dogfighting, the organization of dogfights, the arrangements of wagers for dogfighting ventures, and other activities related to animal fighting and illegal gambling. Given that those involved in such communications are often spread across one or more states (or countries), I know that these communications often occur via electronic means, including email, telephone, text messaging, and social media.

110.    In my experience, I have observed photos, videos, and pedigree information transmitted via text messages, Facebook Messenger, and other electronic means by individuals involving in dogfighting. Additionally, I have listened to audio of individuals involved in dogfighting coordinating dogfighting events, illegal gambling, and other activities related to such violations. I have seen the extensive use of the internet to obtain and share knowledge related to possessing and training animals for animal fighting. I am also aware that individuals exchanging such electronic communications frequently store contact—and potentially identifying—information for

others engaged in animal fighting in their cellular phones and/or electronic address books.

111.     In my training and experience, and based upon my communications with other law enforcement agents who have engaged in similar investigations and my review of information obtained from Facebook and Google search warrants, I believe that that examining data stored on such electronic devices can uncover, among other things:

a.   Evidence that reveals, suggests, or confirms who possessed or used each device and/or who had access to or used the Facebook Account and the Google Account;

b.   Evidence that demonstrates communications, agreement, and association between and among those involved in criminal activities—including animal fighting ventures—as well as evidence of specific instances of such conduct; and

c.   Evidence of engaging in criminal offenses related to animal fighting ventures, such as dogfighting papers, books, documents, and records (like pedigrees), and videos and photographs of dogs and dogfights.

112.     As shown above, Frazer and Murphy engaged in numerous electronic communications (with each other and with others) regarding, or indicative of, illegal dogfighting activities, including the transmission and receipt of videos and photographs. Frazer and Murphy would have needed to use cellular telephones, computers, tablets, or other electronic storage media to do so. Such video and photograph files, and other similar evidence, would likely be found on electronic devices and electronic storage media at the SUBJECT PREMISES.

113.     Further, as discussed above, Frazer and Murphy shared multiple links to the dogfighting website "Peds Online." Accordingly, there is probable cause to believe that evidence in the form of internet history, uploaded and downloaded materials from Peds Online, and other evidence of illegal dogfighting activity will be found on electronic devices and electronic storage media at the SUBJECT PREMISES.

114.     In my training and experience, and based upon my communications with other law enforcement agents who have engaged in similar investigations, I know that electronic data and information can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular telephones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations (including, but not limited to, "cloud" storage).

115.     In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and the later off-site review of that storage media consistent with an appropriate warrant. Though it is sometimes possible to make an image copy of a storage media on-scene in lieu of removing storage media from the premises, I am not requesting authority to search any seized electronic devices/storage media at this time. In the event that such electronic devices/storage media are seized, I anticipate seeking a separate warrant to search those devices/media.

## **CONCLUSION**

116.    Based on the forgoing, I respectfully request that the Court issue the proposed search warrant.

117.    Based on the foregoing, there is probable cause to believe that Frazer and Murphy have violated the federal criminal statutes cited herein, and that evidence, fruits, and instrumentalities of the Subject Offenses—more fully described in **Attachment B**—are located at the SUBJECT PREMISES—more fully described in **Attachment A**. I respectfully request that the Court issue the requested warrant authorizing the search of the SUBJECT PREMISES and the seizure therefrom of the evidence, fruits, and instrumentalities described in **Attachment B.**

118.    I seek permission to allow USDA-OIG to obtain the assistance of Maine State Police and other federal, state, and/or local law enforcement authorities, including the United States Marshals Service ("USMS") and contractors utilized by the USMS for the handling of seized animals, in handling the animals and executing the search of the SUBJECT PREMISES. I also seek permission to allow these parties to seize items identified in **Attachment B**, to take photographs and/or video of any other location, item, or individual at the SUBJECT PREMISES, and to establish safety perimeters as necessary to accomplish the search and seizure.

119.    Necessary veterinary care will be provided to any seized animals as required by 7 U.S.C. § 2156(e).

Respectfully submitted,

Special Agent Kyle Bishop
United States Department of Agriculture
Office of Inspector General

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:   Jun 19 2023

City and state:   Portland, Maine

_Judge's signature_

Karen Frink Wolf,   U.S. Magistrate Judge
_Printed name and title_